**JPMORGAN CHASE BANK, for and on behalf of Mahonia Limited and Mahonia Natural Gas Limited, Plaintiff,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, Travelers Casualty and Surety Company, St. Paul Fire and Marine Insurance Company, Continental Casualty Company, National Fire Insurance Company of Hartford, Fireman's Fund Insurance Company,** Safeco Insurance Company of America, the Travelers Indemnity Company, Federal Insurance Company, Hartford Fire Insurance Company, and Lumbermen's Mutual Casualty Company, Defendants.

No. 01 Civ. 11523(JSR).

United States District Court, S.D. New York.

March 5, 2002.

Frank Mosley, Guy Miller Struve, Davis Polk & Wardwell, New York City, for Plaintiff.

Eva H. Posman, New York City, for Liberty Mutual Insurance Company.

Alan Levine, Kronish Lieb Weiner & Hellman LLP, New York City, for Travelers Casualty and Surety Company, The Travelers Indemnity Company, St. Pauls Fire and Marine Insurance Company

Stewart D. Aaron, Dorsey & Whitney, L.L.P., Armen Shahinian, Scott D. Baron, Wolff & Samson, New York City, for Continental Casualty Company and National Fire Insurance Company of Hartford.

Vincent J. Zichello, Zichello & McIntyre, L.L.P., New York City, Local Counsel and Darren B. Watts, Benjamin Schwartz, George Ellis, Nadine McSpadden, Altheimer & Gray, Chicago, IL, for Fireman's Fund Insurance Company.

Mark S. Gamell, Torre, Lentz, Gamell, Gary & Rittmaster, LLP, Jericho, NY, for Safeco Insurance Company of America, Hartford Fire Insurance Company and Lumbermens Mutual Casualty Company.

Gary L. Leshko, Thomas G. Wilkinson, Esq. (admitted pro hac vice per order dated January 18, 2002), F. Warren Jacoby, Esq. (admitted pro hac vice per order dated January 18, 2002), Stephen Cozen, Esq. (admitted pro hac vice per order dated January 28, 2002), Cozen & O'Connor, New York City, for Federal Insurance Co.

### OPINION AND ORDER

RAKOFF, District Judge.

By this lawsuit, plaintiff JPMorgan Chase Bank, for and on behalf of Mahonia Limited and Mahonia Natural Gas Limited (collectively "Mahonia"), seeks to compel the eleven defendant insurance companies (collectively the "Sureties") to pay Mahonia over $1 billion, pursuant to six surety bonds (the "Bonds") that guaranteed the obligations of Enron Natural Gas Marketing Corporation and Enron North America Corporation (collectively "Enron") on six corresponding natural gas and crude oil forward sales contracts (the "Contracts") entered into between June, 1998 and December, 2000.

According to plaintiff, the facts are simple and straightforward. Under each of the Contracts, Mahonia paid Enron a set sum in return for subsequent deliveries of

natural gas or crude oil extending over many months. *See* Affidavit of Jeffrey Dellapina, sworn to on December 28, 2001 ("Dellapina Aff.") ¶¶ 3–4, Ex. G; Affidavit of Philip N. Bair, sworn to on February 7, 2002 ("Bair Aff.") Exs. A–F. To insure against the risk that Enron might default in part or whole on its promise to deliver the gas and oil, Mahonia not only obtained contractual guarantees from Enron to make monetary payments in the event of such failures but also simultaneously obtained from the Sureties the Bonds here in issue, which guaranteed payment to Mahonia upon any default by Enron. Dellapina Aff. ¶¶ 2, 5, Exs. A–F.

In due course, Enron did indeed default, following which, on December 7, 2001, plaintiff, on behalf of Mahonia, sent written notices to the Sureties demanding payment in accordance with the terms of the Bonds. When the sureties demurred, plaintiff brought this lawsuit and promptly moved for summary judgment in Mahonia's favor, contending that, by the express terms of the Bonds, the Sureties' obligation to pay was immediate and unconditional.

In response to the motion, defendants allege quite different facts. They allege that, unbeknownst to the Sureties at the time they issued the Bonds, the Contracts between Mahonia and Enron were part of a fraudulent arrangement by which simple loans to Enron by plaintiff's predecessor, the Chase Manhattan Bank ("Chase"), were disguised as sales of assets. Specifically, they allege that Chase lent Mahonia the money used to pay Enron on the Contracts, and that, at the very time Enron was contracting to sell to Mahonia future deliveries of gas and oil, Enron was secretly contracting to repurchase the very same gas and oil from one or more entities commonly controlled with Mahonia, at a price equal to what was owed by Mahonia

to Chase on the loan. The net effect was simply a series of loans from Chase to Enron; but by disguising them as sales of assets, Enron could book them as revenue while Chase and Mahonia could, among other things, induce the Sureties to issue Bonds that would effectively guarantee repayment of the loans—something the Sureties were otherwise forbidden to do under applicable New York law (which here governs). *See* N.Y. Ins. Law §§ 1102, 1113(16)(E); 6901(a)(1)(A) (McKinney 2000). In short, defendants allege that the Bonds were the product of fraudulent inducement and fraudulent concealment by the plaintiff.

 Fraudulent inducement and fraudulent concealment are familiar defenses to contractual performance. Yet, New York law does not permit a contracting party to lightly evade its contractual obligations by simply crying "fraud." Thus, for example, under New York law, a claim for breach of contract cannot be converted into a fraud claim by simply alleging that the promisor intended not to perform its promise. *See Papa's–June Music v. McLean,* 921 F.Supp. 1154, 1160–1161 (S.D.N.Y.1996) (collecting cases). Also, of particular relevance here, New York law will not permit a sophisticated party that, in negotiating a contract, has expressly disclaimed reliance on specific oral representations extrinsic to the contract to thereafter claim that the fraudulence of these representations is a defense to contractual performance. *See Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 320–21, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959).

Here, defendants, in seeking to defeat plaintiff's motion for summary judgment on the grounds of fraudulent inducement and/or fraudulent concealment, face three principal hurdles.

*First,* paragraph 7 of each of the Bonds states, inpertinent part:

> The obligations of each Surety hereunder are absolute and unconditional, irrespective of the value, validity or enforceability of the obligations of [Mahonia] under the [corresponding Contract] or Enron under [its separate guarantees] or any other agreement or instrument referred to therein and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety in its capacity as such.

DellapinaAff., Exs. A–F, ¶ 7. Disclaimer language similar tothis was given effect in the decision of the New York Court of Appeals in *Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985), in which, extrapolating on *Danann,* the Court held that corporate officers who had signed guarantees of corporate debt containing such language could not escape payment by arguing that they had been fraudulently induced to sign the guarantees in reliance on the lenders' unfulfilled oral promises to extend a further line of credit to the corporation.

But neither *Plapinger* nor its progeny, *see, e.g., Banco Do Estado De Sao Paulo S.A. v. Mendes Jr. International Co.,* 249 A.D.2d 137, 672 N.Y.S.2d 28, 29 (1st Dep't 1998); *Preferred Equities Corp. v. Ziegelman,* 190 A.D.2d 784, 593 N.Y.S.2d 548, 549 (2d Dep't 1993), avails plaintiff here, for several reasons. To begin with, a full and fair reading of *Plapinger* makes plain that it does *not* stand for the extraordinary proposition—the logical extension of plaintiff's interpretation—that a general sweeping disclaimer can serve to disclaim any and all extrinsic fraud between sophisticated parties. As the Second Circuit stated in *Manufacturers Hanover Trust Company v. Yanakas,* 7 F.3d 310, 316 (2d Cir.

1993), "the mere general recitation that a guarantee is 'absolute and unconditional' is insufficient under *Plapinger* to bar a defense of fraudulent inducement ...". Rather, the Court continued, "the touchstone is specificity," that is, a clear indication that the disclaiming party has knowingly disclaimed reliance on the specific representations that form the basis of the fraud claim. *Id.* Thus, in *Plapinger,* even though the disclaimer language may have been broad and general, it was negotiated as part of the same negotiations in which, the defendants later claimed, they were orally promised an additional line of credit, so that, in agreeing to the disclaimers, the corporate officers had to know that, at a minimum, the disclaimers precluded reliance on any specific oral promises made during the defendants' negotiations with the lenders.

Here, by contrast, even if one assumes *arguendo* that the disclaimers in paragraph 7 of the Bonds preclude reliance on the representations in the underlying Contracts of which the Sureties knew or were on notice, there is no suggestion that the Sureties knew or were on notice of the allegedly circular arrangements between Mahonia, Enron, and other entities that transformed what purported to be insurable sales contracts into disguised loans that the Sureties were prohibited by law from insuring. *See generally Turkish v. Kasenetz,* 27 F.3d 23, 27–28 (2d Cir. 1994) ("It is well settled that parties cannot use contractual limitation of liability clauses to shield themselves from liability for their own fraudulent conduct.").

Furthermore, nothing in the doctrine of *Plapinger* precludes a defense of fraudulent inducement or concealment premised on fraudulent misrepresentations in the Bonds themselves. Here each of the Bonds is expressly premised on Mahonia's having entered with Enron into a gas or oil "Inventory Forward Sale Contract" and

expressly recites that once all the contracted-for gas or oil "is fully delivered" the Sureties' obligations will cease. *See* Dellapina Aff., Exs. A–F, at 1. Plainly implicit in these representations is the assertion that the Sureties are being asked to insure the sale and future delivery of a commodity, rather than being asked to insure, unlawfully, a disguised loan transaction.

In short, nothing in the broad disclaimer language of the Bonds excludes the defense—whether characterized as a defense of fraudulent inducement or fraudulent concealment—that the insured arrangements were a total sham whose reality was totally concealed from the Sureties.

*Second,* plaintiff points out that under New York Insurance Law, a surety that illegally guarantees repayment of a loan is still obligated to make good on that surety. *See* N.Y. Ins. Law § 1303. But as the few cases applying this provision indicate, *see, e.g., Posner v. United States Fidelity & Guaranty Company,* 33 Misc.2d 653, 226 N.Y.S.2d 1011, 1014–1016 (N.Y.Sup.Ct.1962) (describing the rationale behind the almost verbatim predecessor statute, N.Y. Ins. Law § 143), this is a statutory embodiment of the familiar equitable principle that a wrongdoer, whether willful or negligent, should not benefit from his own wrongdoing. By contrast, there is no reason to believe that the statute applies to an innocent, unknowing insurer who is fraudulently induced to illegally insure loans that the insurer has no reason to believe were loans at all. To put it another way, there is nothing to suggest that the statute was intended to change prior law and preclude an insurer from raising a fraud-in-the-inducement defense—a radical change that, absent legislative history, the legislature can not be supposed to have intended. *See Dornberger v. Metropolitan Life Ins. Co.,* 961 F.Supp. 506, 538 (S.D.N.Y.1997) ("cases holding that an insurer who engages in illegality is not permitted to avoid liability on a policy are inapposite—they do not affect the general rule that an innocent party is entitled to rescind a contract based on illegality.").

*Third,* plaintiff argues that defendants' allegations of fraud are too speculative and unsupported by admissible evidence to rebut the solid showing plaintiff has made in support of plaintiff's motion for summary judgment. Even if this were true, however, it would not preclude the Court from refusing to enter summary judgment on plaintiff's behalf at this time, *see* Fed. R.Civ.P. 56(f), for defendants have provided a reasonable justification for further discovery. In particular, defendants have offered substantial evidence that, even while plaintiff was moving with alacrity to obtain summary judgment, defendants were repeatedly rebuffed in their informal attempts to obtain the information regarding the underlying transactions needed to confirm (or refute) defendants' theory. *See, e.g.* Declaration of G. Eric Brunstad, Jr., sworn to on February 3, 2002, at ¶¶ 11–14; Affidavit of Joseph A. Dworetzky, sworn to on February 7, 2002, at ¶¶ 3–4; Affidavit of Deborah A. Feurer, sworn to on February 6, 2002, at ¶ 3; Affidavit of Ronald F. Goetsch, sworn to on January 18, 2002, at ¶¶ 7–9, 11; Affidavit of T. Scott Leo, sworn to on February 7, 2002, at ¶ 4; Affidavit of Sharon A. Sartori, sworn to on February 6, 2002, at ¶¶ 11–12, Affidavit of Benjamin D. Schwartz, sworn to on February 11, 2002, at ¶ 2.

In any event, despite such obstacles, defendants have managed to obtain some important evidence that, taken most favorably to them (as it must be for purposes of this motion), inferentially but materially supports their theory. For example, with respect to the last of the six underlying Contracts here in question, which was entered into between Enron and Mahonia on December 28, 2000, defendants have ob-

tained evidence that, on that very same day, Enron entered into an agreement with an entity called Stoneville Aegean Limited ("Stoneville") to purchase from Stoneville the identical quantities of gas that Enron was that same day agreeing to sell to Mahonia, to be delivered to Enron on the very same future dates as Enron was supposed to deliver the same quantities of gas to Mahonia. *See* Bair Aff., ¶¶ 6–9, Ex. G; Affidavit of David W. Wilson, sworn toon February 8, 2002 ("Wilson Aff.") at ¶ 13.

The fact that Enron would be simultaneously buying from Stoneville the very gas it was selling to Mahonia becomes even more suspicious when considered in light of the further evidence adduced by defendants to the effect that both Mahonia and Stoneville—offshore corporations set up by the same company, Mourant & Company—have the same director, Ian James, and the same shareholders. *See* Bair Aff. Exs. A–G; Affidavit of Elizabeth Anne Wooster, sworn to on February 8, 2002, at Ex. EAW1; transcript, February 27, 2002, at 7.

What, finally, turns suspicion to reasonable inference is defendants' further evidence that, whereas Mahonia agreed in its Contract with Enron to pay Enron $330 million for the gas at the moment of contracting (December 28, 2000), Enron, in its agreement with Stoneville, agreed to pay Stoneville $394 million to buy back the same quantities of gas on the same delivery schedule—but with the $394 million to be paid at specified future dates. *See* Wilson Aff. ¶¶ 14–16, Ex. C.

Taken together, then, these arrangements now appear to be nothing but a disguised loan—or at least have sufficient indicia thereof that the Court could not possibly grant judgment to plaintiff.

The Court has also considered plaintiff's other arguments but finds them to be without merit. Accordingly, plaintiff's motion for summary judgment is hereby denied.

Given the large amount of money at stake, however, it is incumbent on both parties to move with expedition to complete discovery and bring this matter to a determination on the merits. The parties are therefore directed to prepare and present to the Court for its approval, by no later than March 8, 2002, a discovery plan in the form prescribed by this Court's "Form D" that will result in the completion of all discovery by September 16, 2001 and the completion of any post-discovery motion practice by November 1, 2002. A final pretrial conference and oral argument on any such post-discovery motion will be held on November 8 at 9:30 A.M., with rulings thereon to be made no later than November 15, 2002. If not otherwise disposed of, the case will then proceed to trial on December 2, at 9:00 A.M.

SO ORDERED.