**VALLEY NATIONAL BANK, Plaintiff,**

v.

**GREENWICH INSURANCE COMPANY and XL Reinsurance America, Inc., Defendants.**

**No. 02 CV 5069(VM).**

United States District Court, S.D. New York.

April 1, 2003.

450

David M. Schlecker, Anderson, Kill, Olick P.C., New York City, for Valley Nat. Bank.

Mark L. LoSacco, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Newark, NJ, for Valley Nat. Bank, XL Reinsurance America, Inc.

John F. Triggs, Greenberg Traurig, L.L.P., New York City, for Lumbermen's Mut. Cas. Co.

Michael S. Meisel, Cole, Schotz, Meisel, Forman & Leonard, P.A., for Universal Bonding Ins. Co.

William D. Grand, Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, LLP, Woodbridge, NJ, for Robert Nicosia.

Peter J. Pizzi, Connell, Foley, L.L.P., New York City, for Pilgrim Ins.

Patrick C. Dunican, Jr., Gibbons, Del Deo, Dolan, Griffinger & Vecchione, New York City, for Vito V. Gruppuso.

## DECISION AND AMENDED ORDER

MARRERO, District Judge.

Plaintiff Valley National Bank ("Valley") filed a complaint (the "Complaint") in this action against Defendants Greenwich Insurance Company and XL Reinsurance America, Inc. (together, "Defendants"), alleging that Defendants failed to pay Valley money owed pursuant to a bond that Defendants had issued to National Investment Services, Inc. ("National") to guarantee the payment of obligations owed by National to Valley. Promptly after filing the Complaint, Valley brought a motion for summary judgment pursuant to Fed. R.Civ.P. 56 (the "Motion"). Defendants opposed the Motion, and included a series of certifications asking for further discovery pursuant to Fed.R.Civ.P. 56(f). By Order dated March 31, 2003, the Court granted the Motion, and indicated that its findings, reasoning and conclusions would be set forth in a separate Decision and Order to be made available to the parties. Accordingly, for the reasons discussed below, the Motion is GRANTED.

## I. FACTS

As narrated by Valley, the Complaint describes a simple matter regarding two sureties who refused to honor their contractual commitments to guarantee obligations set forth in a Premium Finance Agreement, dated October 1, 2001 (the "PFA"), entered into between Valley and National. Under the PFA, Valley agreed to advance $7,500,000 (the "Funds") to National, which undertook to use the Funds to finance premiums on National's insurance policy with Twin Oaks Insurance Company, Ltd. ("Twin Oaks").[1] Pursuant to a Loan and Security Agreement and a Term Note between Valley and National, dated October 26, 2001 (the "Loan Agreement" and the "Term Note," respectively, and together with the PFA, the "Transaction Documents"), National was scheduled to repay the Funds in eight equal installments of principal every three months, plus accrued interest (the "Installments"). To insure against the risk that National might default on the Installments, Valley received contractual guarantees from National and required National to obtain a premium finance bond (the "Bond") from the Defendants, which guaranteed payment of the obligations owed by National to Valley in the event of any default by National.

The Installments commenced on February 1, 2002. While National paid the first Installment, it failed to make the required payment for the second Installment three months later on May 1, 2002. Two weeks following the missed payment, Valley notified National that it was in default and demanded payment of the remaining amount (the "Remaining Amount") due under the Loan Agreement and Term Note, as well as reasonable costs, expenses and late charges. Simultaneously, Valley notified the Defendants that it was asserting a claim under the Bond for payment of the Remaining Amount together with per diem interest from May 16, 2002. Valley alleges

---

1. Such arrangements, referred to as "insurance premium financing agreements," allow commercial enterprises to pay their insurance premiums in full at the inception of coverage without having to expend large amounts of cash immediately. As part of the arrangements, the insured enters into a premium finance agreement whereby the insured promises to repay the premium finance company the monies advanced, plus finance charges, in amortized monthly installments. See In re Schwinn Bicycle Co., 200 B.R. 980, 982 (Bankr.N.D.Ill.1996).

that, by the express terms of the Bond, the Defendants' obligation to pay was immediate and unconditional.

In response to the Complaint, the Defendants paint a far different portrait of what occurred in this transaction. Defendants allege that, unbeknownst to them at the time they issued the Bond, Valley was either involved in, or aware of, a fraudulent scheme by which Valley and other parties disguised simple loans as premium finance arrangements, then negotiated bonds to guarantee these arrangements. According to the Defendants' chronology, Robert Nicosia ("Nicosia"), then executive vice president of Universal Bonding Insurance Company ("UBIC") and an honorary advisory board member of Valley, originally approached Valley at the beginning of 2001 seeking a $7,500,000 loan on behalf of National, but was rebuffed because National did not meet Valley's credit standards for such a loan. As a result, Defendants allege, Nicosia restructured the transaction as a premium finance arrangement, whereby Twin Oaks would issue an insurance policy to National and in return would receive the Funds in the form of premium payments. However, Defendants assert, Nicosia was in fact the sole shareholder of Twin Oaks, and the Funds never reached Twin Oaks nor were they used to pay insurance premiums.[2]

According to Defendants, because they were unaware that Nicosia had disguised a simple loan as a premium finance arrangement, they agreed to issue the Bond, negotiated by Nicosia, to guarantee National's obligations to Valley under the PFA.[3] Defendants contend that if they had known that the Bond was backing what was essentially a line of credit loan, they would never have issued the Bond because they are not in the business of financial guaranty insurance, a higher risk form of insurance that protects lenders against default by borrowers on financial obligations.[4]

Defendants claim that once informed that National had defaulted on the second Installment, Defendants attempted to investigate the transaction, but Valley was uncooperative. Using the information they were able to gather, Defendants allege that Valley fraudulently induced them to issue the Bond, and ask for the opportunity to conduct further discovery in order to mount a defense based on this allegation.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

#### 1. *Valley's Rule 56 Motion*

In considering a motion for summary judgment, the Court must grant such a

---

**2.** Neither party indicates how the Funds were actually spent.

**3.** Defendants allege that they were encouraged to issue the Bond in part because of a second bond, also negotiated by Nicosia and issued by UBIC and Lumbermens Mutual Casualty Company ("Lumbermens"), that Defendants believed backed the Bond they had issued. UBIC and Lumbermens are involved in two cases before this Court that involve similar parties and raise nearly identical issues. See *Lumbermens Mutual Casualty Co., et al. v. WestRM—West Markets Ltd.,* No. 02 Civ. 7253 (S.D.N.Y.) and *WestRM—West Markets Ltd. v. Lumbermens Mutual Casualty Co., et al.,* No. 02 Civ. 7344 (S.D.N.Y.).

**4.** Financial guaranty insurance is considered higher risk because of the potentially large losses involved. See 4 Wolcott B. Dunham, Jr., *New York Insurance Law* § 54.01 (2002). As a result of these larger risks, the New York Insurance Law requires financial guaranty insurers to confine their business to financial guaranty insurance and a few related lines of insurance, imposes certain licensing and financial reserve requirements, and excludes such insurance from coverage under the New York Property/Casualty Insurance Security Fund, which protects parties with valid insurance policies from losses due to insurer insolvencies. See N.Y. Ins. Law § 6901–6909 (McKinney 2000).

motion only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 346 (S.D.N.Y. 2002) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The role of the Court is not to resolve issues of fact, but rather "to determine as a threshold matter whether there are genuine unresolved issues of material fact to be tried." *Gibson v. Am. Broad. Companies, Inc.,* 892 F.2d 1128, 1132 (2d Cir.1989).

In cases involving notes and guaranties, this Court has held that "a plaintiff establishes its prima facie entitlement to summary judgment by establishing the execution of the agreements at issue and nonpayment thereunder." *Orix Credit Alliance, Inc. v. Bell Realty, Inc.,* No. 93 Civ. 4949, 1995 WL 505891, at *3 (S.D.N.Y. Aug.23, 1995); *see also Sterling Nat'l Bank & Trust Co. v. Fidelity Mortgage Investors,* 510 F.2d 870 (2d Cir.1975) (summary judgment on note appropriate where no disputed issue of fact existed with respect to execution or non-payment). Some authorities consider a contract of guaranty to be synonymous with a contract of suretyship, mainly because both relationships involve a person or entity "who promises to answer for the debt, default, or miscarriage of another...." Cal. Civ.Code § 2787 (1993) (declaring that "[t]he distinction between sureties and guarantors is hereby abolished."); *see, e.g., Yin v. Society National Bank Indiana,* 665 N.E.2d 58, 64 n. 2 (Ind.Ct.App.1996) ("[W]e recognize that the words 'guaranty' and 'guarantor' are synonyms for 'suretyship' and 'surety,' respectively."); *Lowe v. Albertazzie,* 205 W.Va. 47, 516 S.E.2d 258, 263 n. 11 (1999) (citing West Virginia statute to

conclude that "the terms 'surety' and 'guarantor' are widely held to be synonymous"); *see also* Restatement (Second) of Conflict of Laws § 194, cmt. a (1971) (using "suretyship" and "guaranty" interchangeably because "there has never been general agreement as to what distinction, if any, should be drawn between the two terms"); Restatement of Security § 82, cmt. g (1941) (using the term "guaranty" as a synonym for "suretyship"); 38 Am.Jur.2d *Guaranty* § 11 (1999) (noting that "some authorities hold that a contract of guaranty is not distinguishable from a contract of suretyship").

■ The main distinction between a contract of guaranty and a contract of suretyship is that "[a] 'surety' is typically jointly and severally liable with the principal obligor on an obligation to which they are both bound, while a 'guarantor' typically contracts to fulfill an obligation upon the default of the principal obligor." Restatement (Third) of Suretyship and Guaranty § 1, cmt. c. (1996); *see also Anderson v. Rizza Chevrolet, Inc.,* 9 F.Supp.2d 908, 911 n. 2 (N.D.Ill.1998) ("A surety is primarily liable to a creditor. In contrast, a guarantor incurs secondary liability for the debt of another.") (citations omitted).

■ This distinction is relevant in deciding when the obligor's responsibilities begin, but once a determination is made that an obligor has such a responsibility, the difference between the two types of obligatory instruments is not significant, for both involve a promise to answer for a third person's debt. Thus, the prima facie test developed by this Court for plaintiffs moving for summary judgment against a guarantor, which requires proof that the principal debtor has not fulfilled its obligation, should be equally applicable to plaintiffs moving for summary judgment against sureties, especially given that the liability for a surety is stricter because the

surety can "be sued jointly with the principal without demand or notice." 38 Am. Jur.2d *Guaranty* § 12. As a result, Valley must demonstrate only that the Bond was executed by National and Defendants, and that Defendants did not fulfill their payment obligations, in order to establish a prima facie entitlement to summary judgment. Once a prima facie case has been established, the plaintiff is entitled to summary judgment unless the defendant can assert defenses that would raise a genuine issue of material fact. *See Indus. Bank of Japan Trust Co. v. Haseotes*, No. 92 Civ. 6074, 1993 WL 322775, at *4 (S.D.N.Y. Aug.19, 1993).

■ The Court is persuaded that Valley has met its initial burden. Valley has demonstrated, and Defendants do not contest, that the Bond was entered into freely by National and Defendants. Moreover, Defendants admit that they have not yet fulfilled their payment obligations under the Bond. Thus, Valley is entitled to summary judgment requiring Defendants to pay Valley under the terms of the Bond unless Defendants can assert defenses that raise any genuine issue of material fact.

### 2. *Defendants' Rule 56(f) Response*

■ While Rule 56 does not require that any discovery take place before a motion for summary judgment can be granted, *see Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286 (2d Cir.2000), it does provide the opposing party the opportunity to request more time for further discovery if it is unable to present facts essential to justify its opposition. *See* Fed.R.Civ.P. 56(f). As the Second Circuit has explained, this rule exists because of the belief that "[a] party opposing a motion for summary judgment must have had the opportunity to discover information that is essential to its opposition to the motion." *Sutera v. Schering Corp.*, 73 F.3d 13, 18 (2d Cir.1995) (citations omitted); *see also*

*Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 945 F.Supp. 693, 706 (S.D.N.Y. 1996) ("Rule 56(f) requires courts to ensure that parties have a reasonable opportunity to make their record before ruling on a motion for summary judgment").

■ Thus, Rule 56(f) is a safeguard against premature grants of summary judgment and this Court has found that it "should be applied with a spirit of liberality." *Bonnie & Co. Fashions, Inc.*, 945 F.Supp. at 706 (citation omitted). Yet, Rule 56(f) "is not a shield against all summary judgment motions. Litigants seeking relief under the rule must show that the material sought is germane to the defense ..." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir.1994) (citation omitted).

To determine whether an opponent of a summary judgment motion has proven sufficiently that Rule 56(f) should be invoked, the Second Circuit has established a four-part test to examine the affidavit or certification submitted arguing for continued discovery:

> The affidavit must include the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts; and why those efforts were unsuccessful.

*Id.*

The Court shall address the question of whether Defendants have met their burden under Rule 56(f) below.

### 3. *Choice of Law*

The Bond, which was drafted by Defendants, contains a choice of law and forum selection clause that reads:

> The laws of the State of New York shall be applicable in determining the rights and obligations of any party under this

bond and the courts of the State of New York, including the United States District Court for the Southern District of New York shall have exclusive jurisdiction over any dispute arising under this bond.

(Bond, attached as Exhibit 4 to Aff. of Robert J. Chase In Support of Motion for Summary Judgment, dated October 8, 2002 ("Chase Aff."), at ¶ 10.)

While both parties agree that this clause gives exclusive jurisdiction to this Court to hear the Complaint, Valley contends that the choice of law portion of the clause is permissive, and argues that the Court, after employing New York's "interest analysis" test, should use New Jersey law under New York's conflict of laws rules. Defendants disagree with this contention, arguing that the choice of law clause mandates that New York law be applied in adjudicating this dispute.

Neither the parties nor the Court have been able to identify precedent that deals with similarly worded clauses in the context of choice of law. However, other courts in the Second Circuit have ruled on similar disputes involving the mandatory or permissive nature of the verb "shall" when used in forum selection clauses. *See, e.g., John Boutari and Son, Wines and Spirits, S.A. v. Attiki Imp. and Distrib. Inc.*, 22 F.3d 51, 53 (2d Cir.1994) (holding that forum selection clause reading "any dispute ... shall come within the jurisdiction of the competent Greek Courts" was permissive because "shall" in this context only implied that the Greek courts could have jurisdiction, not that they had exclusive jurisdiction); *First Nat'l City Bank v. Nanz, Inc.*, 437 F.Supp. 184, 187 (S.D.N.Y. 1975) (holding that forum selection clause

reading "the Supreme Court of the State of New York, within any county of the City of New York shall have jurisdiction of any dispute" was permissive because "it is susceptible to the interpretation that ... other forums [besides the New York State Supreme Court] may also be appropriate").

■ These cases offer some guidance but are not perfectly analogous because of the inherent distinction between forum selection and choice of law. It is possible, as the foregoing cases demonstrate, for more than one court to have jurisdiction over a matter if the choice of forum is not explicitly stated in the contract. Such ambiguity allows the parties to prosecute the action in a forum of their preference, assuming that the forum has sufficient ties to the matter. Indeed, the Federal Rules of Civil Procedure explicitly discuss the possibility of transfer, either between state and federal courts or between different states or different countries, due to matters of convenience and justice. *See* Fed.R.Civ.P. 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."). It is not practical, however, for more than one dispositive law to be applicable to a matter,[5] nor does the choice of law depend entirely on the preference of the parties. Instead, which law applies is a question that has only one answer, ascertainable first through an explicit choice of law clause and then, if no such clause exists, by a conflict of laws analysis. *See* Restatement (Second) of Conflict of Laws § 186 (1971) (stating that choice of law is determined by

---

**5.** The Court notes that it is possible for parties to "choose to have different issues involving their contract governed by the local law of different states." *See* Restatement (Second) of Conflict of Laws § 187, cmt. i (1971 &

Supp.1989). Thus, in such a situation, more than one state's laws could apply to different aspects of the contract. However, the instant case does not present this type of situation.

parties' choice and otherwise by conflict of laws analysis). Moreover, the parties' choice of law provision need only "establish[ ] to the satisfaction of the forum that the parties have chosen the state of the applicable law." *Id.,* § 187, cmt. a (1971 & Supp.1989). Thus, while the choice of forum may allow several possibilities, the ultimate choice of law analysis yields only one. What that choice of law is may be subject to debate, but in the end, the choice is definitive and exclusive.

The implication of this distinction is that finding a forum selection clause permissive is consistent with the flexibility of forum selection in general, while finding a choice of law provision permissive contradicts the reality that only one body of substantive rules can actually serve as the applicable law to govern final adjudication of the merits of a dispute. Moreover, while it is theoretically possible for a trained lawyer to read the Bond's choice of law provision as being less explicit than other conceivable grammatical variations,[6] a permissive interpretation would directly violate both the preference for honoring the parties' choice of law selection and one of the "prime objectives of contract law," which is "to protect the justified expectations of the parties and allow them to foretell with accuracy what will be their rights and liabilities under the contract." Restatement (Second) of Conflict of Laws § 187, cmt. e (1971 & Supp.1989). This policy of certainty, convenience and predictability of result is crucial, and demands that "the parties should have power to choose the applicable law." *Id.*

▬ Thus, when confronted with a choice of law clause like the one in the Bond, the Court finds the phrase "[t]he laws of the State of New York shall be applicable in determining the rights and obligations of any party under this bond" to be a mandatory assertion · that New York State's laws are the ones that govern the Bond, and are to be used in settling any disputes arising under that instrument. This interpretation is bolstered when considered in conjunction with the equally exclusive mandate of the forum selection clause, which definitively places any litigation about the Bond only in this Court or in New York State courts. The Court is persuaded that the parties—both of them sophisticated entities which had entered into these types of agreements frequently and negotiated the Bond at an arms' length basis—intended to employ New York law in New York courts, including the federal court in the Southern District of New York. *Cf.* Restatement (Second) of Conflict of Laws § 187, cmt. b (1971 & Supp.1989) (noting that choice of law provisions of adhesion contracts, "drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms," should be scrutinized and not enforced if doing so "would result in substantial injustice to the adherent.").

## B. DEFENDANTS' AFFIRMATIVE DEFENSES AND RULE 56(F) MOTION

Proceeding under applicable New York State law, the Court turns to Defendants' opposition ·to the Motion. In accordance with the Court's ruling above, Defendants must assert defenses that raise genuine issues of material fact in order to avoid summary judgment in favor of Valley. In tandem with raising these defenses, Defendants have also submitted to the Court

---

**6.** For example, the Bond's choice of law provision would arguably be less likely to raise an issue for litigation if it had been drafted to read: "The interpretation and application of the terms and conditions of this Bond shall be governed exclusively by the laws of the State of New York."

certifications asking for more time to conduct discovery pursuant to Rule 56(f).

■ Before the Court can consider Defendants' defenses, however, it must examine Valley's contention that Defendants waived all defenses when they agreed to the transactions by virtue of a clause (the "Disclaimer Clause") in the Bond which states:

> The Surety's liability under this bond shall not be released, discharged or affected in any way (except as expressly provided in this bond) by any circumstances or condition (whether or not [Defendants] shall have knowledge thereof), including, without limitation: (a) the attempt or the absence of any attempt by [Valley] to obtain payment or performance by [National] or any other surety or guarantor of the [insurance premium payments]; ... and (c) any other circumstance which might otherwise constitute a legal or equitable discharge or defense of [Defendants], except as provided under this bond. [Defendants] hereby expressly waives and surrenders any defense to its liability under this bond based upon any of the foregoing acts, omissions, agreements, waivers or matters. It is the purpose and intent of this bond that the obligations of [Defendants] hereunder shall be absolute and unconditional under any and all circumstances, except to the extent provided in this bond.

(Chase Aff. Exh. 4, at ¶ 6.)

Under New York law,[7] the seminal case regarding the enforceability of waivers in guaranties is *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985). *See Nat'l Westminster Bank PLC v. Empire Energy Management Sys., Inc.*, No. 93 Civ. 5331, 1998 WL 47830, at *3 (S.D.N.Y. Feb.5, 1998) (noting that the Second Circuit has "recognized *Plapinger* as the controlling expression of New York law" with regard to the issue of waivers in guaranties). The guarantee at issue in *Plapinger* stated that its "absolute and unconditional" nature was "irrespective of (i) any lack of validity ... of the ... Restated Loan Agreement ... or any other agreement or instrument relating thereto, or (vii) any other circumstance which might otherwise constitute a defense to the guarantee." *Plapinger*, 495 N.Y.S.2d 309, 485 N.E.2d at 977. The court upheld this waiver and refused to recognize equitable defenses to the guarantee, in part because the guarantee was not a generalized boilerplate clause, but rather a multimillion dollar guarantee that was signed following extended negotiations between sophisticated business people. *See id.*

■ The Second Circuit, *in Manufacturers Hanover Trust v. Yanakas*, elaborated on *Plapinger* by noting that "in order to be considered sufficiently specific to bar a defense of fraudulent inducement ... a guarantee must contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim." 7 F.3d 310, 316 (2d Cir.1993). Thus, a mere general recitation that a guarantee is "absolute and unconditional" would be insufficient to bar a defense of fraudulent inducement because the "touchstone is specificity." *Id.* In its analysis, the court also identified three significant differences between valid and invalid waivers. First, it found the guarantee before it signed by defendant Yanakas to be a "generalized boilerplate exclusion" that the bank used routinely, and as a result concluded that it was not a product of negotiation. *Id.* at 317. Second, the Yanakas guarantee did not purport to waive any defenses to its own validity. *Id.*

---

7. Consistent with its discussion above, the Court proceeds under the assumption that case law discussing guaranties is equally applicable to bonds issued by sureties.

Third, the Yanakas guarantee had no blanket disclaimer of the type found in *Plapinger*, as to "any other circumstance which might otherwise constitute a defense" to the guarantee. *Id.*

In the instant case, the Court is persuaded by the exchanges between the parties and the fact that the Bond is not a preprinted form, in which certain blanks are filled in by hand, that the guarantee here in contention is "the product of negotiations among sophisticated businessmen that produced custom-crafted instruments." *Frankel v. ICD Holdings S.A.*, 930 F.Supp. 54, 63 (S.D.N.Y.1996) (citing such reasoning in holding that party had waived any defense of fraud in the inducement). Thus, the situation at bar is different from the one in *Yanakas*, where defendant, who was the party contesting the disclaimer, had been presented with boilerplate language on a preprinted form drafted by the bank and the court found that no negotiations over such language had taken place. *See Yanakas*, 7 F.3d at 317 (noting that the "form was one that [the bank] apparently used routinely" and that "there was no evidence that the scope or character of the Guarantee was the product of any negotiations between the parties").

Indeed, not only was the Bond the product of negotiations, but Defendants themselves, in addition to being experienced sureties who presumably issue such bonds frequently, drafted the terms of the Bond. In fact, Defendants' underwriting manager rejected a draft of the Bond submitted by Nicosia and in response attached a bond form, which it claimed was "the only one we are now using for these transactions." (Memorandum from Scott Adams to Bob Nicosia, dated October 3, 2001, attached as Exh. B to Certification of Scott Adams In Opposition To Plaintiff's Motion for Summary Judgment, dated November 11, 2002 ("Adams Cert.").) Thus, considering that Defendants drafted and proposed the language to be used in their surety transactions, it is difficult to imagine that they did not thoroughly examine the implications of contractual language that made their obligations under the Bond "absolute and unconditional."

Furthermore, the issue of specificity of the disclaimer, viewed as so crucial to the court in *Yanakas*, is less applicable in this situation where the drafter and more sophisticated party in the transaction now claims that the disclaimer is too broad and not specific enough. All of the cases that the *Yanakas* court relied on to build its rule of specificity involved situations where the non-drafting and typically less sophisticated party accepted a contract containing a disclaimer defendant later asserted did not waive its defense of fraud in the inducement. *See, e.g., Manufacturers Hanover Trust Co. v. Restivo*, 169 A.D.2d 413, 564 N.Y.S.2d 141, 141 (App.Div. 1st Dep't) (mem.) (finding that a family which signed guarantees with a bank could not claim that the bank fraudulently represented the nature of the guarantees because of the specificity of the disclaimer in the guarantees), *appeal dismissed*, 77 N.Y.2d 989, 571 N.Y.S.2d 914, 575 N.E.2d 400 (1991); *First City National Bank & Trust Co. v. Heaton*, 165 A.D.2d 665, 563 N.Y.S.2d 783, 783–84 (App. Div. 1st Dep't 1990) (mem.) (finding that a related couple who had signed a personal guarantee to secure a loan with a bank could not invoke fraud-in-inducement defense that was "in direct contradiction to their specific acknowledgement" made in the guarantee); *Marine Midland Bank, N.A. v. CES/CompuTech, Inc.*, 147 A.D.2d 396, 537 N.Y.S.2d 818, 819–20 (App. Div. 1st Dep't 1989) (mem.) (finding that a business which had entered into loan agreements and accompanying promissory note with a bank could not claim fraudulent inducement because of a disclaimer that expressly waived any right to assert defenses relating to the

note or the transactions and which was "sufficiently specific to foreclose the defense of fraudulent inducement").

In sum, the *Yanakas* court apparently was striving to protect the party who had not originally drafted the disclaimer and who might have less sophistication in such matters from being tied to a broad disclaimer that prevented an affirmative defense in situations which that weaker party had never contemplated. The equitable underpinning of *Yanakas* is not applicable to rescue Defendants here, as these sophisticated insurance entities, which are in the business of providing bond guarantees of the type in question and earning corresponding fees from their commitments, not only drafted the disclaimer and used it routinely in their business, but negotiated at length the specific terms of the financing with another sophisticated lending institution.

Even if this Court were to require more specificity in the Disclaimer Clause, the Court remains persuaded that subsection (c) of the Disclaimer Clause sufficiently covers a situation like the one at bar, preventing a release from liability under "any other circumstance which might otherwise constitute a legal or equitable discharge or defense of [Defendants], except to the extent provided in this bond." (Chase Aff. Exh. 4, at ¶ 6.) The exception clause at the end demonstrates that both parties had an opportunity to further clarify and carve out any additional exceptions for liability they wanted to make, but ended up settling for the inclusive language of the disclaimer waiver.

Along with the issue of boilerplate language and specificity, the court in *Yanakas* found significance in the absence of a blanket disclaimer, and the lack of a waiver of defenses to the validity of the guarantee itself. The Bond at issue here contains two blanket disclaimers of the type found in *Plapinger*, the first one as described in

the preceding paragraph and the second one which states that Defendants "expressly waive[ ] and surrender[ ] any defense to [their] liability under this bond based upon any of the foregoing acts, omissions, agreements, waivers or matters" listed earlier in the Disclaimer Clause. (Chase Aff. Exh. 4, at ¶ 6.) Moreover, the defense that Defendants have mounted does not depend on the validity of the Bond itself, but rather on the validity of the transaction contained in the Transaction Documents. Thus, whether or not the Bond waives any defenses to its own validity is irrelevant.

Other cases in the aftermath of *Plapinger* and *Yanakas* similarly support Valley's position. *See Nat'l Westminster Bank PLC*, 1998 WL 47830, at *3–4 (finding that a disclaimer in the guarantee at issue waived defense of fraudulent inducement because it was the product of negotiations between sophisticated parties, did not purport to waive defenses to its own validity, and contained a blanket disclaimer); *Frankel*, 930 F.Supp. at 63 (finding that the disclaimer waived the defense of fraudulent inducement because it made payment "unconditional and irrevocable" despite "existence of any claim, set-off defense or other right" of obligor and was a product of negotiations among sophisticated parties); *Fortunoff v. Triad Land Associates*, 906 F.Supp. 107, 119 (E.D.N.Y.1995) (plaintiffs waived their right to allege fraud defense where the guarantee provided that "[t]he maker waives the right to interpose any defense, set-off or counterclaim of any nature or description ... in which the Payee or any other holder of this Note shall be an adverse party").

Defendants rely heavily on *JPMorgan Chase Bank v. Liberty Mutual Ins. Co.*, 189 F.Supp.2d 24 (S.D.N.Y.2002), to support their claim that they have not waived their defenses. In *JPMorgan*, a recent

case involving the high profile Enron scandal, this Court ruled on the enforceability of a waiver to a bond containing provisions similar to the one at issue in the instant action. JPMorgan, which had loaned money to two companies called Mahonia Limited and Mahonia Natural Gas Limited, sued on the companies' behalf in order to collect over $1 billion in payment on bonds issued by eleven sureties, which had guaranteed the obligations of Enron Natural Gas Marketing Corporation and Enron North America Corporation on a variety of natural gas and crude oil forward sales contracts to which Mahonia and Enron were parties and on which Enron had defaulted. *See id.* at 25–26. Just as Valley does in the instant case, JPMorgan argued that the sureties were required to pay Enron's obligations under the bonds, while the sureties responded as Defendants do here, alleging that the Enron contracts were part of a fraudulent arrangement that masked a simple loan that they could not have insured otherwise under New York law. *See id.*

As part of its findings, the court held that the broad disclaimers in the bonds—which seemingly made the bonds enforceable regardless of the validity of the Enron contracts—did not preclude a defense of fraudulent inducement because the alleged fraudulent arrangements were negotiated separately from the bonds at issue without the defendants present, making it virtually impossible that the defendants could have had knowledge of the purported fraud. *See id.* at 27. The court also noted that the Enron contracts themselves contained potentially material misrepresentations because they referred to the sale and delivery of commodities, which never happened. *See id.* at 28.

However, *JPMorgan* involved an unusual case of fraud at the extreme, embodied in the deceptive business practices of the now · defunct Enron Corporation. In *JPMorgan*, the sureties believed that they were insuring a sale of assets, and, more specifically, the delivery by Enron of gas and oil. Instead, Enron had created a scheme whereby it sold gas and oil to Mahonia for a lump sum paid all at once (and lent to Mahonia by JPMorgan), then repurchased the gas and oil from another company, which had the same director and shareholders as Mahonia, for a larger sum that was paid over time. This scheme created a simple loan from JPMorgan to Enron, but by disguising it as a sale of assets, Enron could book it as revenue and induce the sureties to issue bonds that guaranteed the loans would be repaid, which the sureties would not have been able to do under New York law.

By contrast, the instant case involved a loan of money from Valley to National to finance insurance premiums. While it is questionable whether the money was ever used to actually purchase the insurance premiums, this transfer of the Funds did occur exactly as described in the Transaction Documents, with money being transferred from Valley to National Program Services, Inc. ("NPS"), which served as National's insurance broker. (*See* Wiring Instructions, attached as Exh. 5 to Chase Aff.) The issue of how the Funds were actually used was not important to Valley's due diligence efforts because Valley is not forbidden from lending to a business for general capital expenditures. Rather, its only concern would have been that the loan be paid back. For these same reasons, the structure of the loan was also not important to Valley, and Valley even admits that the arrangement was initially structured as a working capital line of credit to enable National to finance its insurance premiums, but in the process of negotiations was reworked as a premium finance agreement. (*See* Reply Affidavit of Robert J. Chase In Support of Motion for Summary Judgment, dated December 5, 2002

("Chase Reply Aff."), at ¶ 4.) Thus, the only parties for whom the destination of the Funds and the structure of the transaction would be important are Defendants because they are barred under New York law from insuring loans. However, it is not the duty of Valley to perform Defendants' due diligence on a contract negotiated by and between Defendants and National, and signed by representatives from those entities.

Moreover, as compared with the defendants in *JPMorgan,* Defendants here have offered little to no evidence to implicate Valley in the alleged fraud or to demonstrate that Valley had any knowledge that the Funds were not to be used for purchasing insurance premiums. Indeed, the *JPMorgan* defendants, by virtue of demonstrating that Mahonia was involved in Enron's scheme, were able to clearly link JPMorgan to Mahonia and Enron because JPMorgan was actually suing on behalf of Mahonia. In the instant case, Valley has never represented itself as being affiliated with National in any respect other than to have entered into the Transaction Documents with National.

Defendants offer the Loan Agreement, which was issued the day after Defendants issued the Bond, as an example of how Valley was aware of and involved in the purported fraud, alleging that the Loan Agreement changed the structure of the transaction as Defendants understood it by providing that Valley advance the Funds to National as opposed to Twin Oaks directly. In fact, the Loan Agreement actually provided that Valley would advance the Funds to NPS, not National. Regardless, the Court is not persuaded either way that the destination of the Funds raises a material issue because Defendants themselves claim that Twin Oaks was merely a sham company controlled by Nicosia. Thus, whether the Funds went to NPS or to Twin Oaks, the question remains the same: were the proceeds going to be used to purchase insurance premiums or not? Once again, the Court is persuaded that this is an issue about which Defendants should have been concerned, not Valley.

■■ Defendants also attempt to establish Valley's role in the alleged fraud with a certification filled with hearsay, which offers the representations of an attorney working with UBIC to· investigate the transactions at issue here. (*See* Certification of Gerald H. Gline ("Gline"), dated November 8, 2002 ("Gline Cert.").) [8] Gline alleges that Vito Gruppuso ("Gruppuso"), the president and owner of National and NPS

> indicated that everyone at Valley, including Robert Chase (Valley's Loan Officer), knew that the loan proceeds were not going to be used for insurance premium financing and that the loan transaction was really a line of credit loan. Mr. Gruppuso also indicated that Mr. Chase knew that an insurance policy was not being issued.

(Gline Cert., at ¶ 5.)

■■ The Court notes that if it were to consider this evidence as submitted under Rule 56(f), such evidence "need not be presented in a form suitable for admission as evidence at trial, so long as it rises sufficiently above mere speculation" and therefore "reliance on hearsay is not, per se, a dispositive defect under Rule 56(f)." *Simas v. First Citizens' Federal Credit Union,* 170 F.3d 37, 46 (1st Cir.1999). However, the evidence submitted by Defendants is so tenuous as to be unsuitable even under Rule 56(f). First, the use of the verb "indicated" suggests that Gruppuso never directly said that the staff of Valley was aware of the destination of the Funds, and that instead Gline is only pro-

---

**8.** The Court notes that the certification does not actually have a title.

viding the Court with his impression of what Grupposo said or suggested during their conversations.[9] Moreover, this impression could be the result of Gline's inaccurate understanding of Grupposo's description of a situation that is much like the one Valley acknowledged occurred, where the transaction was originally designed as a loan and then modified during negotiations to be a premium finance arrangement. Because these allegations are being made second-hand, the Court cannot discount this possibility. Finally, Gline's impression is explicitly refuted by Chase, who denies the truth of Gline's statement in his reply affidavit and asserts that "[i]t was my understanding that the proceeds from the Premium Finance Agreement were to be used to purchase an insurance policy." (Chase Reply Aff., at ¶ 3.) All of these factors lead the Court to accord Gline's affidavit little credibility in determining the facts of the situation or the ability for Defendants to assert a defense.

Defendants' Rule 56(f) motion would also likely pursue their speculations regarding Nicosia's involvement in the alleged scheme. Defendants argue that Nicosia originally asked for a $7,500,000 loan from Valley, but was turned down. Yet, this allegation is derived from the hearsay statements of Scott Adams ("Adams"), President of Avalon Risk Associates, Inc., which served as underwriting manager to the Defendants. In his affidavit to the Court, Adams explains that at the time he talked to Nicosia about issuing the Bond, Adams

did not know [National] had previously applied for a loan from [Valley] in the amount of $7,500,000, and Valley had rejected the application because [National] did not meet [Valley's] credit standards for such a loan. [Adams] was not aware of [National's] failed attempt to secure that loan from [Valley] until after the [Bond] had been issued on October 25, 2001.

(*See* Adams Cert., at ¶ 2–3.)

Adams' statement is presented with no indication of how he discovered this information, and is even couched in such a way as to avoid a direct statement that Nicosia had applied for the loan on National's behalf and been rejected because of poor credit.[10] Instead, Adams tells the Court he "did not know" and "was not aware" of National's (and presumably Nicosia's) actions, leaving open the possibility that his lack of knowledge and awareness was due to the fact that the loan request never happened. In fact, Chase explicitly denies that Nicosia ever "approached [him], or to the best of [his] knowledge, anyone at Valley seeking a loan on behalf of National." (*See* Chase Reply Aff., at ¶ 5.) As with Gline's affidavit, these factors lend little credibility to Adams' assertions.

Defendants also attempt to imply that there was an illicit connection between Nicosia and Valley by asserting that Nicosia had been an adviser to Valley's Board of Directors during the time of the alleged fraudulent transaction. (*See* Adams Cert.,

---

**9.** The Court notes that this impression transforms in Defendants' memorandum of law into a declaration that Gruppuso *"has stated"* that Robert Chase ("Chase"), a loan officer and the Vice President of Valley, "knew that the loan proceeds from the Premium Finance Agreement were not going to be used for insurance premium financing and that the loan was actually a line of credit loan." (See Opposition of Defendants Greenwich Insurance Company and XL Reinsurance America,

Inc. to Plaintiff Valley National Bank's Pre-Discovery Motion for Summary Judgment, dated November 11, 2002 ("Def.Opp."), at 3.) (emphasis added)

**10.** The Court notes that while Adams' certification lists National as the loan applicant (*see* Adams Cert., at ¶ 3), Defendants' memorandum of law states that Nicosia sought the loan. (*See* Def. Opp., at 4.)

at ¶ 18; Defendants' Opp., at 3.) However, according to an affidavit filed by Gerald Lipkin, Valley's Chairman, President and Chief Executive Officer, Nicosia was merely a bank customer and member of Valley's honorary advisory board, which contains approximately 215 members, exercises no decision-making authority, performs no policy making functions, and serves only a ceremonial position that afforded Nicosia an opportunity to attend two luncheons per year and Valley's annual golf outing. (*See* Reply Affidavit of Gerald H. Lipkin In Support of Motion for Summary Judgment, dated December 6, 2002, at ¶ 3.)

Under Defendants' Rule 56(f) motion, Defendants apparently hope to pursue, among other things, the issue of Nicosia's alleged loan attempt and his possible influence at Valley. However, the Court is not inclined to indulge Defendants' desire to engage in a lengthy inquiry based on mere speculation that Nicosia was initially rejected when he applied for National to receive a loan or that Nicosia's position on Valley's honorary advisory board may have enabled Valley to participate in an alleged fraud. *See Seils v. Rochester School Dist.,* 192 F.Supp.2d 100, 116 (W.D.N.Y.2002) ("[A] court can reject a request for discovery [under Rule 56(f) ] if it deems the request to be based on speculation as to what potentially could be discovered."); *Gray v. Town of Darien,* 927 F.2d 69, 74 (2d Cir.1991) ("In a summary judgment context, an 'opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of [a summary judgment] motion'") (quoting *Contemporary Mission, Inc. v. United States Postal Serv.,* 648 F.2d 97, 107 (2d Cir.1981)), *cert. denied,* 502 U.S. 856, 112 S.Ct. 170, 116 L.Ed.2d 133 (1991); *Capital Imaging Assoc. v. Mohawk Valley Medical Assoc.,* 725 F.Supp. 669, 680 (N.D.N.Y.1989) (citing *Waldron v. Cities Serv. Co.,* 361 F.2d 671,

673 (2d Cir.1966)) (citations omitted) (While "Rule 56(f) discovery is specifically designed to enable a plaintiff to fill material evidentiary gaps in its case ... it does not permit a plaintiff to engage in a 'fishing expedition' "), *aff'd,* 996 F.2d 537 (2d Cir.), *cert. denied,* 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993).

Thus, the Court is persuaded that Valley has met its burden for summary judgment, that Defendants waived all defenses in the Disclaimer Clause of the Bond they drafted, and that Defendants' Rule 56(f) motion has failed to demonstrate how the facts sought are reasonably expected to raise a genuine issue of material fact.

## III. *ORDER*

For the reasons described above, it is hereby

**ORDERED** that the Court's Order dated March 31, 2003 in this action is amended to incorporate the discussion set forth herein; and it is further

**ORDERED** that Plaintiff Valley National Bank's motion for summary judgment is granted.

The Clerk of Court is directed to close this case.

**SO ORDERED.**