OPINION
 

 FARNAN, District Judge.
 

 Pending before the Court are Motions for Partial Summary Judgment filed by the Third-Party Defendant and Counterclaim Plaintiff PNC Bank, N.A. (“PNC”) (D.I. 110 in C.A. No. 02-1294 JJF) and Plaintiff Wilmington Trust Of Pennsylvania (“Wilmington Trust”). (D.I. 29 in C.A. No. 02-1361 JJF.) For the reasons discussed, the Motions will be granted.
 

 BACKGROUND
 

 The background relevant to these actions has been set forth in more detail by the Court in its previous Memorandum Opinion in
 
 MBIA Insurance Corp. v. Royal Indemnity Co.,
 
 286 F.Supp.2d 347, 348-351 (D.Del.2003). By way of brief summary, this case involves an alleged breach of contract arising from insurance policies (the “Policies”) issued by Defendant Royal Indemnity Company (“Royal”) to PNC and Wilmington Trust
 
 [1]
 
 in connection with the purchase and origination of student loans by Student Finance Corporation (“SFC”). By its Motion, PNC seeks Partial Summary Judgment on Counts I through III of its Counterclaims.
 
 [2]
 
 Specifically, PNC seeks a declaratory judgment that its Policy is valid and enforceable and that PNC is a direct beneficiary of its Policy. PNC also alleges in Counts II and III that Royal breached the Policy it issued to PNC. As a result of these alleged breaches, PNC requests the Court to enter judgment in its favor in the amount of $110,449,275.
 
 [3]
 
 By its Motion, Wilmington Trust requests the Court to grant 1) specific performance requiring Royal to perform its obligations under Wilmington Trust’s Policies,
 
 [4]
 
 and 2) a money judgment against Royal in the amount of $12,908,966.43 plus interest for breach of contract.
 

 
 *DCXXVII
 
 The Policies in the instant action insured the payment of principal and ninety days worth of interest in the event of defaults on the underlying student loans. The Policies provide that a default occurs whenever a student loan is delinquent more than ninety days. (D.I. 109; Ex. A at 3 in C.A. No. 02-1294 JJF; D.I. 30; Ex. A at 3; Ex. B at 3 in C.A. No. 02-1361 JJF). Further, the Policies contain broad waiver of defense clauses in the event of a “Loss.” (D.I. 109; Ex. A at Art. I in C.A. No. 02-1294 JJF; D.I. 30 Ex. A at Art. I; Ex. B at Art. I in C.A. No. 02-1361 JJF.) The Policies define “Loss” as a claim that the Plaintiffs submit to Royal for a student loan in default. (D.I. 109; Ex. A at Art. 2 in C.A. No. 02-1294 JJF; D.I. 30 Ex. A at Art. 2; Ex. B at Art. 2 in C.A. No. 02-1361 JJF.)
 

 STANDARD OF REVIEW
 

 Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if a court determines from its examination of “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,” that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party.
 
 Goodman v. Mead Johnson & Co.,
 
 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence.
 
 Reeves v. Sanderson Plumbing Prods., Inc.,
 
 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000).
 

 To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to:
 

 do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with “specific facts showing that there is a genuine issue for trial.” ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is “no genuine issue for trial.”
 

 Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
 
 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)(quoting Fed.R.Civ.P. 56). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment.
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 

 DISCUSSION
 

 First, due to the voluminous briefing and oral argument on these Motions, the Court will outline what it finds to be the parties’ positions.
 
 [5]
 
 The Plaintiffs contend that under the clear language of their Policies, Royal has waived all defenses it may have, including fraud in the inducement, to avoid payment. The Plaintiffs also contend that they were not parties to SFC’s fraudulent acts. Further, the Plaintiffs contend that any discovery is unnecessary and summary judgment is appropriate, because there is no circumstance in which Royal can avoid its payment obligation.
 

 Through its presentation at oral argument and the briefs it relies upon,
 
 [6]
 
 Royal
 
 *DCXXVIII
 
 contends that fraud in the inducement precludes the entry of summary judgment in the Plaintiffs’ favor. Royal contends that the Policies contain no specific waiver of its fraud defense and that the broad waiver of defenses in the Policies does not provide for a waiver of fraud in the inducement. At most, Royal concedes that the Policies contain an ambiguity that prevents the entry of judgment in the Plaintiffs’ favor.
 

 Royal also contends that it is entitled to rescind the Policies because of SFC’s fraudulent misrepresentations. Further, Royal contends that the “known loss” doctrine and the fact that the Policies are insurance policies and not guaranties precludes the entry of judgment.
 

 As an initial matter, the Court concludes that the Plaintiffs are direct beneficiaries of their Policies. Royal has presented no case, and the Court has found none, which would negate the Policies’ identification of the Plaintiffs as the beneficiaries. (D.I. 109; Ex. A at 1 in C.A. No. 02-1294 JJF);
 
 see also
 
 4 Couch on Insurance § 59:1 (3rd ed.2003) (stating that the insured is generally unrestricted in its right to name a beneficiary of its policy).
 

 Further, despite Royal’s contentions, the Court concludes that Delaware law does not prohibit disclaimers of fraud claims. Although Delaware case law demonstrates a reluctance to honor such disclaimers where the parties are unsophisticated and where the disclaimers are boilerplate and contain language they did not bargain for, Delaware courts have honored disclaimers of fraud, and specifically fraud in the inducement, where the contract at issue involves sophisticated parties and negotiated disclaimer language.
 
 Compare Norton v. Poplos,
 
 443 A.2d 1 (Del.1982) (finding that rescission of a real estate contract was not barred by a boilerplate clause which stated that title to the property in question is “subject to all existing encumbrances and restrictions of record.”),
 
 with Great Lakes Chemical Corp. v. Pharmacia Corp.,
 
 788 A.2d 544, 555-56 (Del.Ch.2001) (finding a valid disclaimer of fraudulent inducement where highly sophisticated parties, “assisted by industry consultants and experienced legal counsel, entered into carefully negotiated disclaimer language after months of extensive due diligence” and where the parties explicitly allocated risks under a Purchase Agreement).
 

 Also, as noted in the Court’s previous Memorandum Opinion, the Court finds that case law involving guaranties and sureties is directly on point with regard to the instant Motions.
 
 Royal,
 
 286 F.Supp.2d at 355. First, the Court observes that the Policies operate like guaranties. Specifically, the Policies' define a “Default” as ninety days’ delinquency on a student loan. (D.I. 109; Ex. A at Art. II: E in C.A. No. 02-1294 JJF; D.I. 30; Ex. A at Art. II: D; Ex. B at Art. II: E in C.A. No. 02-1361 JJF). The Policies identify the Plaintiffs as the beneficiaries entitled to claim any “Loss” from a Default, and a “Loss” is defined as the “Value” of the student loan, which in turn is defined as the principal balance outstanding under the loan, plus accrued interest up to the Default Date. (D.I. 109; Ex. A at Arts. I, II in C.A. No. 02-1294 JJF; D.I. 30; Ex. A at Arts. I, II; Ex. B at Arts. I, II in C.A. No. 02-1361 JJF.) In other words, the Policies provide that if a student defaults, Royal will pay the loan plus interest up until the time of default.
 

 
 *DCXXIX
 
 Further, the language of the Policies supports the conclusion that the Policies are guaranties, where the Policies define Royal’s obligations as “absolute and unconditional.” The case law and secondary sources also indicate that these are customary words used to make guaranties.
 
 See, e.g., First Fed. Sav. Bank v. CPM Energy Sys. Corp.,
 
 1991 WL 35689, at *1-2 (Del.Super. March 12, 1991);
 
 Citibank, N.A. v. Plapinger,
 
 66 N.Y.2d 90, 95, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985); 39 Corpus Juris Secondum (“C.J.S.”)
 
 Guaranty
 
 § 9 (Interim Ed.2002).
 

 Moreover, in the Court’s view, the fact that the Policies are labeled “Credit Risk Insurance” does not negate the guaranty nature of the Policies, where credit risk insurance is often defined as a “financial guaranty.”
 
 See, e.g.,
 
 Rupp’s Insurance & Risk Management Glossary (1996);
 
 see also Seattle First Nat’l Bank v. Wash. Ins. Guar. Ass’n,
 
 116 Wash.2d 398, 804 P.2d 1263, 1266 (1991) (stating that “[c]redit risk insurance is a form of surety insurance.”). Also, commentators have recognized that “financial risk insurance” includes “both guaranties that are written, insurance policies, and those that are surety bonds,” and have pointed out that “[s]inee both insurance and surety can accomplish the same thing, it is not usually important which form the guaranty takes.” Beverly B. Wadsworth,
 
 Financial Risk Insurance: A New Concept?,
 
 Suretyscope, Winter 1986, at 13-14 (1986). Suretyship is also recognized as a class of insurance
 
 under
 
 Delaware law.
 
 See
 
 18 Del. C. § 102 (including in the definition of insurance the undertaking “to act as a surety.”) Further, some courts have recognized that parties may opt to provide a guaranty in the form of an insurance policy.
 
 See, e.g., Chase Manhattan Bank v. New Hampshire Ins. Co.,
 
 193 Misc.2d 580, 749 N.Y.S.2d 632, 643 (2002). Therefore, the Court concludes that cases dealing with guaranties and sureties are relevant to the instant Motions and with this backdrop, the Court will examine some of the cases relied upon by the parties.
 
 [7]
 

 The parties have not presented, nor has the Court found, any Delaware cases that present similar factual circumstances and issues, and therefore, the Court will look to other jurisdictions for guidance. The Court finds two cases particularly persuasive as to the issues presented in this case.
 
 See Valley Nat’l Bank v. Greenwich Ins. Co.,
 
 254 F.Supp.2d 448 (S.D.N.Y.2003);
 
 Citibank, N.A. v. Plapinger,
 
 66 N.Y.2d 90, 95, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985).
 
 [8]
 
 The
 
 Plapinger
 
 case involved a guaranty which provided that the defendant’s obligation to pay was “absolute and unconditional” regardless of “(i) any lack of validity... of the ... Restated Loan Agreement ... or any other agreement or instrument relating thereto, or (vii) any other circumstance which might otherwise constitute a defense to the guarantee.”
 
 Id.
 
 at 95, 495 N.Y.S.2d 309, 485 N.E.2d 974. The court upheld this waiver and
 
 *DCXXX
 
 declined to recognize equitable defenses, including fraudulent inducement, in part because the guaranty was not a boilerplate clause, but instead a multimillion dollar guaranty that was heavily negotiated between sophisticated business parties.
 
 See id.
 
 The court concluded “that the language of disclaimer in the guaranty] is sufficiently specific to foreclose as a matter of law the defenses and counterclaims based on fraud, negligence or failure to perform a condition precedent asserted against plaintiff banks.”
 
 Id.
 
 at 93, 495 N.Y.S.2d 309, 485 N.E.2d 974.
 

 The
 
 Valley National
 
 case involved a Premium Finance Agreement (“PFA”) between Valley and National.
 
 Id.
 
 at 451. Under the PFA, Valley agreed to advance $7,500,000 (the “Funds”) to National, which sought to use the Funds to finance premiums on National’s insurance policy with Twin Oaks Insurance Company, Ltd. (“Twin Oaks”). Also, pursuant to a Loan and Security Agreement and a Term Note between Valley and National, National was scheduled to repay the funds in eight installments.
 
 Id.
 
 In order to ensure against the risk that National might default, Valley received contractual guaranties from National and required National to obtain a premium finance bond from Greenwich Insurance and Reinsurance America, which guaranteed payment of the obligations owed by National to Valley in the event of any default by National.
 
 Id.
 

 The Disclaimer clause in the Bond stated:
 

 The Surety’s liability under this bond shall not be released, discharged or affected in any way (except as expressly provided in this bond) by any circumstances or condition (whether or not [defendants] shall have knowledge thereof), including, without limitation: (a) the attempt or the absence of any attempt by [Valley] to obtain payment or performance by [National] or any other surety or guarantor of the [insurance premium payments]; ... and (c) any other circumstance which might otherwise constitute a legal or equitable discharge or defense of [defendants], except as provided under this bond. [Defendants] hereby expressly waives and surrenders any defense to its liability under this bond based upon any of the foregoing acts, omissions, agreements, waivers or matters. It is the purpose and intent of this bond that the obligations of [Defendants] hereunder shall be absolute and unconditional under any and all circumstances, except to the extent provided in this bond.
 

 Id.
 
 at 457 (quotation omitted).
 

 National missed the second of eight installment payments and two weeks following the missed payment, Valley notified National that it was in default and demanded payment of the remaining amount due under the Loan Agreement and Term Note.
 
 Id.
 
 Simultaneously, Valley notified Greenwich Insurance and Reinsurance America that it was asserting a claim under the Bond for payment of the remaining amount, under the terms of the Bond which stated that their obligation to pay was immediate and unconditional.
 
 Id.
 
 at 451-452. In response, Greenwich Insurance and Reinsurance America alleged that unbeknownst to them, at the time they issued the Bond, Valley was either involved in, or aware of a fraudulent scheme where Valley and other parties disguised simple loans as premium finance arrangements, and then negotiated bonds to guarantee these arrangements.
 
 Id.
 
 Greenwich Insurance and Reinsurance America contended that they would not have issued the Bond if they were aware of the true nature of the transactions and alleged that Valley fraudulently induced it to issue the bonds, and asked for further
 
 *DCXXXI
 
 discovery in order to mount a defense based on this allegation.
 
 Id.
 

 In considering Valley’s motion for summary judgment, the court set forth the standard for summary judgment when considering an obligor’s responsibility for payment of a guaranty explaining:
 

 Valley must demonstrate that the Bond was executed by National and the Defendants, and the Defendants did not fulfill their payment obligations, in order to establish a prima facie entitlement to summary judgment. Once a prima facie entitlement has been established, the plaintiff is entitled to summary judgment unless the defendant can assert defenses that would raise a genuine issue of material fact.
 

 Id.
 
 at 454. The court then went on to distinguish its case from several cases relied upon by the defendants and granted summary judgment in favor of Valley, finding that under the negotiated Bond, Greenwich Insurance and Reinsurance America had an absolute obligation to pay and had waived any defense of fraud, and therefore, there were no genuine issues of material fact.
 
 Id.
 
 at 463. In granting summary judgment in favor of Valley, the court noted the importance of several factors. First, the court noted that the Bond was a product of negotiations and was not a preprinted form as in
 
 Manufacturers Hanover Trust v. Yanakas,
 
 7 F.3d 310 (2d Cir.1993).
 
 Id.
 
 at 458. Second, the court pointed out that the defendants themselves, in addition to being experienced in sureties, drafted the terms at issue in the Bond.
 
 Id.
 
 at 458. Further, the court noted in regard to the issue of specificity of the disclaimer, that it is “less applicable in this situation where the drafter and more sophisticated party in the transaction now claims that the disclaimer is too broad and not specific enough.”
 
 Id.
 
 The court in
 
 Valley National
 
 also went on to distinguish
 
 JPMorgan Chase Bank v. Liberty Mutual Ins. Co.,
 
 finding that it “involved an unusual case of fraud at the extreme, embodied in the deceptive business practices of the now defunct Enron.”
 
 Id.
 
 at 459-460.
 

 Similarly, in the instant matter, the Court finds that the Policies are the product of negotiation. Moreover, Royal is an experienced, sophisticated party in the business of issuing “Credit Risk Insurance.” Although Royal contends that SFC drafted the Policies at issue, the Plaintiffs had no part in the drafting of these provisions, and the provisions at issue were obviously a product of negotiation between Royal and SFC which took place over a long period of time.
 

 Further, the Court finds the cases relied upon by Royal to be inapposite to the instant situation. For example, the defendant in
 
 Yanakas,
 
 who was contesting a disclaimer, was presented with boilerplate language on a preprinted form drafted by the bank and the court found that no negotiations took place over the language at issue.
 
 Yanakas,
 
 7 F.3d at 317. On the other hand, in this ease, the policies are Royal’s own policies insuring SFC, which it negotiated. Further, Royal relies heavily on the
 
 JPMorgan Chase
 
 case to support its contention that it has not waived the defense of fraud in the inducement. However, like the court in
 
 Valley National,
 
 the Court finds that
 
 JPMorgan Chase
 
 was an unusual and extreme case, and therefore, provides little guidance as to the issues before it. In
 
 JPMorgan,
 
 the sureties were led to believe that they were insuring the sale of assets, which were the delivery by Enron of gas and oil. However, the transaction was actually a scheme whereby Enron sold gas and oil to Mahonia for a lump sum single payment, then it repurchased the gas and oil from another company, which had the same directors and share
 
 *DCXXXII
 
 holders as Mahonia, for a larger sum that was paid over time. This scheme resulted in a simple loan from JP Morgan to Enron that was held out to be a sale of assets, so that Enron could induce the sureties to issue bonds that guaranteed that the loans would be repaid, a result which the sureties would not have been able to achieve under New York law.
 

 Unlike the facts here, the
 
 JPMorgan Chase
 
 case involved a situation where the whole transaction at the center of the dispute was a sham involving sales of assets being represented as pure loans. Additionally, although Royal seeks further discovery as to the Plaintiffs’ role in SFC’s alleged fraud, as compared to the Defendants in the
 
 JPMorgan Chase
 
 case, Royal has not come forward with any evidence to implicate the Plaintiffs in any alleged fraud. However, even if they had, the Court finds that any evidence of fraud would be irrelevant to its analysis, because under the express terms of the Policies negotiated by Royal it waived any such defense. Therefore, the Court finds that there are no genuine issues of material fact and discovery as to Royal’s proffered defenses is unwarranted.
 
 [9]
 

 The Court concludes that the most persuasive evidence of Royal’s express waiver of a fraud in the inducement or invalidity defense against the Plaintiffs is the unambiguous language of the Policies. Specifically, Wilmington Trust’s Policy numbered RST147533 states:
 

 ADDITION AND REMOVAL OF STUDENT LOANS
 

 The insurer’s obligation to pay any Claim made under this Policy is
 
 absolute, unconditional and irrevocable
 
 and shall not in any way be affected, mitigated or eliminated by (x) a
 
 breach of any representation or warranty made by the Insured,
 
 the Servicer, Student Finance Corporation or the Beneficiary, or (y) the failure of the Insured or Student Finance Corporation to comply with the Underwriting Policies, or (z) the status of any Student Loan, added hereto.
 

 (D.I. 30; Ex. B at 7 in C.A. No. 02-1361 JJF)(emphasis added). Both of Wilmington Trust’s Policies also include a waiver of defense clause, which provides:
 

 NOTWITHSTANDING ANY OTHER PROVISION OF THIS POLICY TO THE CONTRARY, THE RIGHT OF THE BENEFICIARY TO RECEIVE PAYMENT FOR LOSS UNDER THIS POLICY AFTER PAYMENT OF THE INITIAL PREMIUM BY THE INSURED SHALL BE ABSOLUTE AND UNCONDITIONAL, AND NO FAILURE ON THE PART OF THE INSURED OR THE BENEFICIARY TO OBSERVE OR PERFORM ANY COVENANT OR CONDITION CONTAINED IN THIS POLICY ... SHALL ENTITLE THE INSURER TO ANY ... DEFENSE AGAINST THE BENEFICIARY OR ANY OTHER PARTIES OR OTHERWISE RELIEVE THE INSURER OF ANY LIABILITY TO MAKE ANY SUCH PAYMENT FOR LOSS TO THE BENEFICIARY UNDER THIS POLICY, SUBJECT ONLY TO THE LIMIT OF LIABILITY.
 

 Id.
 
 at 10; Ex. A at 9 (emphasis in original). The language of these provisions is clear: Wilmington Trust’s right to payment is “absolute, irrevocable and unconditional”
 
 *DCXXXIII
 
 irrespective of the failure of SFC, the insured, to perform any covenant or condition, and no such failure will entitle Royal to
 
 any
 
 defense, including fraud in the inducement or invalidity of the Policy, against the beneficiaries.
 

 Further, PNC’s Policy includes a similar waiver of defense clause plus a waiver of “any fraud” defense Royal may have.
 
 [10]
 
 This language clearly sets forth that Royal’s obligation to pay PNC is “absolute, irrevocable and unconditional” irrespective of
 
 “any fraud
 
 ” in relation to the student loans or the validity of the insurance agreements and
 
 any other defenses
 
 that may be available to Royal to avoid payment.
 

 Although at oral argument Royal contended that the language in the Policies does not rise to the level of the “touchstone of specificity” required where the disclaimer has to track the substance of the misrepresentation, the Court concludes that sophisticated parties are not required to provide a laundry list of specific situations where defenses are waived when the negotiated language clearly states that
 
 any
 
 defenses are waived.
 
 See e.g., Citibank, N.A. v. Plapinger,
 
 66 N.Y.2d 90, 95, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985) (affirming strike of fraud counterclaim where the guaranty, directing defendants obligations to pay stated that its “absolute and unconditional” nature was “irrespective of (i) any lack of validity ... of the ... Restated Loan Agreement ... or any other agreement or instrument relating thereto, or (vii) any other circumstance which might otherwise constitute a defense to the guarantee.”);
 
 Valley Nat’l,
 
 254 F.Supp.2d at 463 (granting summary judgment in favor of plaintiff and denying defendant’s request for discovery where surety bond described the defendant’s obligation as “absolute and unconditional under any and all circumstances, except to the extent provided in this bond.”).
 
 [11]
 
 Additionally, the Court finds it significant that the Plaintiffs are neither the insured nor the insurer under any of the Policies, and therefore, took no part in the drafting or negotiation of any of the provisions at issue.
 

 In sum, the Court is persuaded that the Plaintiffs have satisfied their burden for summary judgment and demonstrated that Royal has waived all defenses in the above-quoted disclaimer clauses of the Policies it negotiated. Royal has failed to demonstrate that there are any genuine issues of material fact, because Royal has an unconditional obligation to pay the Plaintiffs for their claims on the defaulted loans, regard
 
 *DCXXXIV
 
 less of any fraud in the inducement or validity defenses. Accordingly, the Court concludes that the Plaintiffs’ claims are premised on unambiguous contract language, and therefore, the Plaintiffs are entitled to payment pursuant to the Policies.
 

 CONCLUSION
 

 For the reasons discussed, the Motions for Partial Summary Judgment filed by PNC and Wilmington Trust will be granted.
 

 Appropriate Orders will be entered.
 

 ORDER
 

 At Wilmington, this 26th day of March,
 
 2004,
 
 for the reasons discussed in the Opinion issued this date;
 

 IT IS HEREBY ORDERED that:
 

 1) PNC Bank, N.A.’s (“PNC”) Motion for Partial Summary Judgment (D.I. 110 in Civil Action No. 02-1294 JJF) is
 
 GRANTED;
 

 a) The Royal Indemnity Company (“Royal”) Credit Risk Insurance Policy Number RST147529 is in full force and effect;
 

 b) PNC is the beneficiary of Credit Risk Insurance Policy Number RST147529;
 

 e) Royal shall pay PNC the amount of $110,449,275 which Royal failed to pay when due and any additional sums that have since become due under the Credit Risk Insurance Policy number RST147529.
 

 2) Wilmington Trust of Pennsylvania’s (“Wilmington Trust”) Motion for Partial Summary Judgment (D.I. 29 in Civil Action No. 02-1361 JJF) is
 
 GRANTED;
 

 a) The Royal Indemnity Company (“Royal”) Credit Risk Insurance Policy Numbers RST321276 and RST147533 (the “Policies”) are in full force and effect and Royal is ordered to specifically perform its obligations under the Policies;
 

 b) Royal shall pay Wilmington Trust the amount of $12,908,966.43 plus applicable interest which Royal failed to pay when due and any additional sums that have since become due under the Policies.
 

 [1]
 

 . The Court will refer to PNC and Wilmington Trust as the "Plaintiffs” where appropriate.
 

 [2]
 

 . By its Motion, PNC also seeks a declaratory judgment that “Royal must dismiss with prejudice all of the claims it has asserted against PNC Bank ... in the action it commenced in the Jefferson County, Texas District Court.” (D.I. 110 in C.A. No. 02-1294 JJF.) Although it is less than clear to the Court because of the lack of information provided by the parties regarding this matter, it appears to the Court that Royal previously dismissed the Texas action.
 
 See
 
 (D.I. 140 at 40 in C.A. No. 02-1294 JJF.) Accordingly, the Court will not address PNC’s claim for declaratory relief with respect to the Texas action.
 

 [3]
 

 . PNC's Policy is policy number RST147529.
 

 [4]
 

 . Wilmington Trust's Policies are policy numbers RST321276 and RST147533.
 

 [5]
 

 . It is uncontested that Delaware law governs this matter.
 

 [6]
 

 . Royal chose not to file an opposing brief to PNC's Motion, instead relying upon its contentions presented at oral argument on June 25, 2003 and its briefs filed in opposition to the summary judgment motions of MBIA Insurance Corporation, Wells Fargo Bank Minnesota, N.A., and Wilmington Trust Com
 
 *DCXXVIII
 
 pany. (D.I. 47, 48, 74, 76, 116-18 in C.A. No. 02-1294 JJF and D.I. 34-37 in C.A. No. 02-1361 JJF.)
 

 [7]
 

 . The Court also notes that many of the cases relied upon by Royal in oral argument on June 25, 2003, involved guaranty and surety agreements. See, e.g.,
 
 JPMorgan Chase Bank v. Liberty Mutual Ins. Co.,
 
 189 F.Supp.2d 24 (S.D.N.Y.2002);
 
 Manufacturers Hanover Trust v. Yanakas,
 
 7 F.3d 310 (2d Cir.1993).
 

 [8]
 

 . Although
 
 Plapinger
 
 is a New York case, Delaware courts have relied on this case when conducting an analysis on waiver of defenses or counterclaims. See e.g.,
 
 Relational Funding Corp. v. TCIM Services, Inc.,
 
 2003 WL 360255, 2003 U.S. Dist. Lexis 2370 (D.Del. Feb. 14, 2003) (citing
 
 Plapinger
 
 in holding that counterclaims are barred by specific language of a Lease);
 
 In re IBP, Inc. Shareholders Litig.,
 
 789 A.2d 14, 62 (Del.Ch.2001) (citing
 
 Plapinger
 
 for the proposition that a contractual agreement that representations outside of contract were not relied upon prevented a fraud in the inducement claim).
 

 [9]
 

 .
 
 See e.g., Valley Nat'l,
 
 254 F.Supp.2d at 463 (denying request for further discovery on the issue of plaintiff's role in fraud in the inducement under Civil Rule of Procedure 56(f) because the Court declined to "engage in a lengthy inquiry based on mere speculation” and found that the Defendants waived all defenses including fraud in the disclaimer clause of the Bond.).
 

 [10]
 

 . The relevant portion of this waiver provides: “THE RIGHT OF THE BENEFICIARY TO RECEIVE PAYMENT FOR LOSS ... SHALL BE ABSOLUTE, IRREVOCABLE AND UNCONDITIONAL IRRESPECTIVE OF (A) ANY FRAUD WITH RESPECT TO THE STUDENT LOANS... OR (C) ANY OTHER RIGHTS OR DEFENSES THAT MAY BE AVAILABLE TO THE INSURER TO AVOID PAYMENT OF ITS OBLIGATION UNDER THIS POLICY ....’’ (D.I. 109; Ex. A at Art. XI, in C.A. No. 02-1294 JJF) (emphasis in original).
 

 [11]
 

 . The Court also concludes that the waivers in the Policies included a waiver of Royal’s Known Loss doctrine defense.
 
 See Playtex v. Columbia Cas.,
 
 No. 88C-MR-233, 1993 WL 390469, *9 (Del.Super. Sept. 20, 1993) (stating that the Known Loss doctrine provides that a party cannot insure something that is not a risk) (citing
 
 Intermetal Mexicana,
 
 S.A. v.
 
 Ins. Co. of North Am.,
 
 866 F.2d 71 (3d Cir.1989)). Wilmington Trust’s Policy numbered RST147533 provides that no “breach of any representation or warranty made by [SFC]” shall affect payment to the Plaintiffs. Further, in pertinent part, Wilmington Trust's Policy numbered RST321276 and PNC's Policy provide that their right to receive payment is "absolute and unconditional.” The Court concludes that these broad waivers preclude Royal from avoiding payment by asserting its Known Loss doctrine defense.